J-S02003-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.L.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.J., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1714 EDA 2023 |

Appeal from the Decree Entered June 7, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000004-2023

BEFORE:   LAZARUS, P.J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, P.J.:                **FILED FEBRUARY 12, 2024**

R.J. (Mother) appeals from the order, entered in the Court of Common Pleas of Philadelphia County, involuntarily terminating her parental rights with respect to her child, J.L.L. (Child) (born 5/18).[1]  Counsel has filed a petition to withdraw pursuant to ***Anders v. California***, 386 U.S. 738 (1967), and

_____

[*] Former Justice specially assigned to the Superior Court.

[1] ***Commonwealth v. Walker***, 185 A.3d 960 (Pa. 2018), does not apply in the instant case as the June 7, 2023 order does not change Child's permanency goal from reunification to adoption, but rather scheduled a future goal change hearing.  ***See*** Order, 6/7/23.  Mother was not required to file two separate notices of appeal, however, she mistakenly did so.  ***See*** 1713 EDA 2023.  Mother's appeal with respect to the goal change was quashed by our Court on August 4, 2023.  Order, 8/4/23.  ***See Walker***, 185 A.3d at 976 ("Where . . . one or more orders resolves issues arising on more than one docket or relating to more than one judgment, separate notices of appeals must be filed."); ***see also In re M.P.***, 204 A.3d 976, 981 (Pa. Super. 2019) (applying ***Walker*** holding to children's fast track appeals).

***Commonwealth v. McClendon***, 434 A.2d 1185 (Pa. 1981).[2]   After careful review, we deny counsel's petition and direct counsel to file either a compliant ***Anders*** brief or an advocate's brief, in conformance with our decision.

The trial court set forth the following relevant history leading to Child's adjudication of dependency and placement into the custody of the Philadelphia Department of Human Services (DHS):

> On September 24, 2018, DHS received a General Protective Services [(GPS)] report alleging that [Mother] presented herself to her primary care physician's office and expressed that she wanted help with housing, drug and alcohol treatment, and mental health treatment.  Mother admitted to using phencyclidine [(PCP)] while Child slept at night.  The report stated that Mother disclosed that she was recently in an inpatient program at Gaudenzia[, a substance abuse and co-occurring disorders treatment provider,] with Child, but she did not complete the program; that Mother was attempting to get back into an inpatient program, but her insurance would not cover it; that Mother had a lot of insight into her addiction and was aware that she needed support with staying sober; and that Mother was participating in an outpatient program at Drexel Medicine.  The report alleged that Mother was supervised by an adult probation officer and was subject to random urine tests; that Mother was attempting to move out of the home of [D.L. (Father)[3]], Child's [f]ather; that Mother was residing with a friend at the time of the report; that Mother wanted ongoing assistance with housing and[,] potentially, a dual diagnosis treatment program she could attend with Child.  The report was substantiated.

---

[2] ***See In re V.E.***, 611 A.2d 1267 (Pa. Super. 1992) (extending ***Anders*** briefing requirements to termination of parental rights appeals involving indigent parents represented by court-appointed counsel).

[3] Father is not a party to the present appeal.  At the time of the termination hearing, Mother and Father did not live together and Father testified that he barely sees Mother.  ***See*** N.T. Termination Hearing, 6/7/23, at 71-72.

On September 26, 2018, DHS met with Child, Mother, and Father at Father's home and Child appeared happy, healthy, and with all of his needs met. Mother stated that she attended [t]he Caring Together program at Drexel to address her history of substance abuse. Mother requested that DHS assist her with housing. Mother denied using drugs around Child. Mother further stated that she was diagnosed with bipolar disorder and depression. Father denied knowing that Mother was using drugs again. Father was aware that Mother was attending therapy for substance abuse and that he provided care for Child while Mother attended her program. Father had a history of substance abuse and attended Sobriety Through Out-Patient, Inc. to address his drug and alcohol concerns. DHS found the home to be appropriate.

On November 7, 2018, DHS visited the family and Child appeared happy and was safe. Mother reported she had [neither] used drugs recently[,] nor thought about using drugs. Father stated that he supported Mother and ensured she attended her drug treatment program daily. Father stated that he was moving into a larger home and told Mother that she was welcome to reside there. DHS subsequently closed the case for Child.

On December 27, 2018, DHS received a GPS report alleging that Mother had five children who resided with various family members and foster families; that on December 26, 2018, Mother left Interim House West[, a residential treatment program,] and returned under the influence of PCP, which she admitted using; that Mother had Child in her care the whole time she was away from Interim House West; and that the staff supervised Child until Mother seemed to be able to care for herself. The report stated that Child had bronchitis and [] had been taken to a hospital for medical care several times. The report[] further stated that Mother [had] mental health concerns and suffered from bipolar disorder, severe depression, and post-traumatic stress disorder [(PTSD)]. The report was substantiated.

On December 28, 2018, DHS met with Mother and Child at Interim House West. DHS noted that Child appeared lethargic and had a runny nose. Mother admitted that she used PCP at a friend's house while Child was in her care. Mother stated that she had learned that her former paramour was being released from prison, which caused her distress. Mother stated that she was fearful of her former paramour[,] with whom she experienced domestic violence. Mother stated that she did not want Child removed from her care and would remain drug free and follow the facility rules.

DHS spoke to an Interim House West Administrator, who stated that Mother had been in the program for less than 30 days and had not complied with the rules of the program. The administrator stated that Mother had returned to the facility under the influence of drugs multiple times. DHS transported Mother and Child to a hospital. Child was later discharged to Father's care.

On May 17, 2019, DHS met with Child, Mother, and Father at the Children's Hospital of Philadelphia [(CHOP)]. Child had an upper respiratory infection and needed to be monitored. CHOP staff further stated that Father appeared at CHOP agitated and was aggressive towards the staff. DHS interviewed Father, who denied having current substance abuse or mental health issues. Father stated that he last attended treatment at Wedge Recovery Centers and was not currently in treatment. Father stated that he was interested in caring for Child when Child was discharged from the hospital.

DHS subsequently learned that Father is the perpetrator of an indicated Child Protective Services [(CPS)] report dated September 24, 2015[,] concerning Child's half-sibling[.] Father exposed [the then] three-year[-]old [c]hild to PCP[,] which resulted in [the child's] hospitalization. DHS further learned that Mother was Father's paramour at the time and was in the home during the incident. On May 17, 2019, DHS obtained an [o]rder for [p]rotective [c]ustody [] for Child and [Child] remained at CHOP. On May 19, 2019, Child was discharged from CHOP and transported to his foster care placement with Turning Points for Children, where he currently remains.

Trial Court Opinion, 10/26/23, at 1-4 (citations and footnote omitted); *see also* DHS Petition, 05/23/19, Ex. A ¶¶ f-q.

Pursuant to the court's order, Mother was to have weekly supervised visits with Child, and Mother was referred to the Clinical Evaluation Unit (CEU) for immediate drug screening, monitoring, and three random drug screens prior to the next court date. *See* Order 5/28/19. In addition, Mother's DHS case plan objectives included parenting classes, substance abuse treatment, and securing employment and housing. *See* N.T. Termination Hearing,

6/7/23, at 42. Throughout the time Child has been in placement, Mother has attempted drug and alcohol treatment programs at least three times, but has not been consistent or successful in completing a program. *Id.* at 43-44. Makeda Hunter, case manager supervisor with Turning Points for Children, CUA-5,[4] also testified that Mother has been unable to secure safe and stable housing while Child has been in DHS' care. *Id.* at 44. Regarding employment, Hunter testified that Mother does have a job for which she was able to provide pay stubs. *Id.* Mother has generally appeared for weekly visits with Child, but is often late. *Id.* at 44-45 (case manager testifying visitation records show several instances of Mother arriving at end of visit between January and June of 2023). Over the lifetime of Child's placement, Mother's compliance with her case plan objectives was determined to be minimal.[5] *Id.* 48-49.

---

[4] Philadelphia DHS works alongside neighborhood organizations, called Community Umbrella Agencies (CUAs), to ensure the provision of services within a neighborhood when possible. There are ten CUA regions within Philadelphia. *See Department of Human Services Who's involved in your case?*, CITY OF PHILADELPHIA, https://www.phila.gov/departments/department-of-human-services/whos-involved-in-your-case/ (last visited Jan. 31, 2024).

[5] We note that Mother's case plan compliance was initially substantial or complete, but that her compliance appeared to decrease at the end of 2020 and was minimal by the fall of 2021. A review of the dependency record reveals the following findings during the lifetime of the case:

- August 8, 2019 permanency review order: visitation with Child's mother to remain weekly and supervised by the Agency.
- November 1, 2019 permanency review: Mother has substantially complied with permanency plan.
- January 17, 2020 permanency review: Mother has been fully compliant with permanency plan; Mother to have unsupervised weekly visits, the

*(Footnote Continued Next Page)*

Since May of 2019, Child has remained in the same foster placement, in kinship placement.[6]  *Id.* at 37-38.  Child lives with foster parent, foster parent's adopted niece, and Child's older half-sister, who was adopted by foster parent.  *Id.* at 38-39.  Child is very bonded to foster parent, refers to

_____

Agency to supervise one visit per month, pending Mother does not have positive drug test results.

- June 10, 2020 permanency review:  Mother has substantially complied with permanency plan; visitations to be virtual due to Covid; Mother to have unsupervised overnight visits once Covid restrictions lifted and Mother has suitable housing.
- November 2, 2020 permanency review:  Mother has moderately complied with permanency plan; Mother's visits to be supervised by the Agency.
- March 22, 2021 permanency review:  Mother has moderately complied with permanency plan; Mother's visits to be supervised by the Agency.
- August 2, 2021 permanency review:  Mother's compliance not noted.
- October 25, 2021 permanency review:  Mother has minimally complied with permanency plan; Mother's visits to be supervised by the Agency.
- May 16, 2022 permanency review:  Mother has minimally complied with permanency plan; Mother's visits to be supervised by the Agency.
- September 2, 2022 permanency review:  Mother's compliance not noted.
- November 28, 2022 permanency review:  Mother's compliance not noted.
- December 19, 2022 permanency review:  Mother's compliance not noted, however stated that Agency is unable to verify certain objectives, but that Mother is attending visits with Child; Mother's visits to be supervised by the Agency.
- January 23, 2023 permanency review:  Mother has minimally complied with permanency plan; Mother's visits to be supervised by the Agency.
- April 12, 2023 permanency review:  Mother's compliance not noted.

[6] Child was temporarily in respite care following allegations of abuse by foster parent's spouse.  CUA case manager Makeda Hunter testified that foster parent and spouse were separated and that foster parent was pursuing a divorce.  *See* N.T. Termination Hearing, 6/7/23, at 40.

her as "Mommy," and the two appear to have an "affectionate relationship." ***Id.*** at 40-41.

On January 6, 2023, DHS filed petitions seeking to terminate Mother's and Father's parental rights. On June 7, 2023, the trial court held a termination hearing[7] at which Mother, Father, two CUA case workers, a CEU evaluator, and a social worker testified. At the conclusion of the hearing, the trial court held in abeyance its decision with respect to Father, but found clear and convincing evidence to involuntarily terminate Mother's parental rights with respect to Child. On that same date, the trial court entered a decree terminating Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8) and (b) of the Adoption Act.[8]

Mother filed a timely notice of appeal. Thereafter, on November 29, 2023, counsel filed a petition to withdraw, as well as an accompanying ***Anders*** brief.[9]

---

[7] At the termination hearing, Harry Levin, Esquire, represented Child's legal interests, and Jane Marie Morrissey, Esquire, guardian *ad litem* (GAL), represented Child's best interests. ***See*** 23 Pa.C.S.A. § 2313(a).

[8] 23 Pa.C.S.A. §§ 2101-2938.

[9] Pursuant to Pa.R.A.P. 1925(c)(4):

> If counsel intends to seek to withdraw in a criminal case pursuant to ***Anders***/***Santiago*** or if counsel intends to seek to withdraw in a post-conviction relief appeal pursuant to ***Turner***/***Finley***, counsel shall file of record and serve on the judge a statement of intent to withdraw in lieu of filing a [Rule 1925(b)] Statement.

*(Footnote Continued Next Page)*

In ***In re V.E.***, ***supra***, our Court stated:

> Counsel appointed to represent an indigent parent on a first appeal from a decree involuntarily terminating his or her parental rights, may, after a conscientious and thorough review of the record, petition this court for leave to withdraw representation if he or she can find no issues of arguable merit on which to base the appeal. Given the less stringent standard of proof required and the quasi-adversarial nature of a termination proceeding in which a parent is not guaranteed the same procedural and evidentiary rights as a criminal defendant, the court holds that appointed counsel seeking to withdraw representation must submit an ***Anders*** brief.

***Id.*** at 1275. Moreover, we held that "any motion to withdraw representation, submitted by appointed counsel, must be accompanied by an *advocate's brief*, and not the *amicus curiae* brief delineated in ***McClendon***." ***Id.*** (emphasis original); ***see also In re Adoption of R.I.***, 312 A.2d 601, 602 (Pa. 1973) ("[T]he logic behind . . . an individual in a criminal case being entitled to representation by counsel at any proceeding that may lead to 'the deprivation of substantial rights' . . . is equally applicable to a case involving an indigent parent faced with the loss of her child.").

When counsel seeks to withdraw pursuant to ***Anders*** and its progeny, this Court may not review the merits of the appeal without first addressing the request to withdraw. ***See In re Adoption of M.C.F.***, 230 A.3d 1217,

---

Pa.R.A.P. 1925 (c)(4). ***See In the Interest of J.T.***, 983 A.2d 771 (Pa. Super. 2009) (where ***Anders*** procedure from criminal proceedings has been applied to parental termination cases, parent's counsel acted appropriately by following Rule 1925(c)(4) in appeal from decision terminating parental rights to child).

1219 (Pa. Super. 2020); *see also Commonwealth v. Daniels*, 999 A.2d 590, 593 (Pa. Super. 2010) ("We reiterate that [w]hen presented with an *Anders* brief, this [C]ourt may not review the merits of the underlying issues without first passing on the request to withdraw.") (internal quotations omitted). To procedurally withdraw, counsel must:

> (1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; (2) furnish a copy of the [*Anders*] brief to the [appellant]; and (3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.

*Commonwealth v. Cartrette*, 83 A.3d 1030, 1032 (Pa. Super. 2013) (en banc) (citations omitted); *see also In re Adoption of V.G.*, 751 A.2d 1174 (Pa. Super. 2000) (reiterating requirements counsel must satisfy before being permitted to withdraw in termination appeals).

With respect to the third *Anders* requirement, that counsel inform the appellant of his or her rights in light of counsel's withdrawal, this Court has held that counsel must "attach to [his or her] petition to withdraw a copy of the letter sent to [the] client advising him or her of their rights." *Commonwealth v. Millisock*, 873 A.2d 748, 752 (Pa. Super. 2005).

An *Anders* brief must also comply with the following requirements:

> (1) provide a summary of the procedural history and facts, with citations to the record;
>
> (2) refer to anything in the record that counsel believes arguably supports the appeal;

- 9 -

(3) set forth counsel's conclusion that the appeal is frivolous; and

(4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

***Commonwealth v. Santiago***, 978 A.2d 349, 361 (Pa. 2009). Finally, this Court must "conduct an independent review of the record to discern if there are any additional, non-frivolous issues overlooked by counsel." ***Commonwealth v. Flowers***, 113 A.3d 1246, 1250 (Pa. Super. 2015) (footnote omitted).

Instantly, counsel filed a petition to withdraw. ***See*** Application to Withdraw as Counsel, 11/29/23. Counsel also provided a copy of the letter sent to Mother, notifying her that counsel was requesting to withdraw, attaching a copy of the ***Anders*** brief, including the petition to withdraw, and informing Mother of her right to retain new counsel or proceed *pro se* and raise any issues worthy of consideration.[10] ***See Anders*** Brief, 11/29/23, at Ex. B. However, our review of counsel's petition and ***Anders*** brief does not reflect the type of zealous review required. ***See Santiago***, 978 A.2d at 355-56 ("[C]ounsel must consistently serve the client's interest to the best of his or her ability. Only after such an evaluation has led counsel to the conclusion that the appeal is 'wholly frivolous' is counsel justified in making a motion to withdraw."). Further, we note that the petition to withdraw neither mentions

_____

[10] Mother has not responded to this communication.

- 10 -

counsel's "conscientious examination of the record," *see Cartrette*, *supra*, nor is the *Millisock* letter attached to the petition as required.

Moreover, rather than framing potential issues in the brief in support of Mother's appeal, counsel solely advances arguments in support of the termination decree, and bookends those arguments with statements that she has made a conscientious review of the record and has concluded that the appeal would be wholly frivolous. *See generally Anders* Brief, 11/29/23, at 18-29. This is in direct violation of *Santiago*, wherein our Supreme Court reiterated:

> To repeat, what the brief **must** provide under *Anders* are references to anything in the record that might arguably support the appeal. Indeed, we have recognized and emphasized the difference between **an *Anders* brief**, which **offers an issue for a court's consideration, but reflects counsel's candid assessment of the complete lack of merit in his [or her] client's case**, and a merits brief, which implies that an issue is worthy of review and has some chance of succeeding.

*Santiago*, 978 A.2d at 359-60 (citations omitted) (emphasis added).

Specifically, counsel's brief with respect to termination under section 2511(b) practically mirrors the trial court's section 2511(b) analysis found in its Rule 1925(a) opinion. Moreover, counsel's brief includes no reference to the record in support of the appeal.[11] *Compare Anders* Brief, 11/29/23, at 26-28 *with Santiago*, 978 A.2d at 360.

_____

[11] The trial court referenced testimony that Child was "significantly bonded with [his foster] parent[,] who he has lived with for the past four years[;]" that Child calls the foster parent "mom" and wishes to be adopted by her; that
*(Footnote Continued Next Page)*

The determination of the best interests of the child is a separate consideration from a finding that a statutory ground for termination has been met under section 2511(a) and is "the paramount consideration in deciding whether to terminate parental rights." *In re S.D.T., Jr.*, 934 A.2d 703, 706 (Pa. Super. 2007). Essential to a court's section 2511(b) analysis is discerning "the nature and status of the parent-child bond, [by] paying close attention to the effect on the child of permanently severing the bond." *In re C.P.*, 901 A.2d 516, 520 (Pa. Super. 2006). While expert testimony and a formal bonding analysis are not specifically required by statute, the moving party must at least produce sufficient evidence to prove that severing the bond between child and parent will not have negative effects on the child. *Id.* In addition, the proper way to evaluate the parent-child bond in termination cases is to focus strictly on the bond between the parent and child and the possible ramifications of severing this bond. *Id.* at 521.

In this case, the only testimony as to the possible effect of severing any bond between Mother and Child came from CUA case worker, Makeda Hunter, who stated that she did not believe it would "cause irreparable harm" to Child to terminate Mother's parental rights. N.T. Termination Hearing, 6/7/23, at 50. However, the record reveals Hunter was not qualified to provide testimony as to the relationship between Mother and Child. Because Hunter was not

---

Child's primary bond is with the foster parent; and that Mother expressed a bond with Child, but failed to offer any evidence of such a bond. Trial Court Opinion, 10/26/23, at 16 (citing N.T. Termination Hearing, 6/7/23, at 38, 7-8, 40-41, 93-94). Counsel's only references to the record were the same.

present at a single visit between Mother and Child, she could only comment from "reading the notes" that Mother and Child would frequently have a snack and watch a movie during Mother's visits. *Id.* at 49, 51. In addition, Hunter was not asked the basis for her opinion as to severing the bond between Mother and Child, nor was she cross-examined on her statement. *See generally id.* at 49-64. Aaron Lloyd, a former CUA case worker who worked with the family from approximately November 2020 to May 2022, was not asked a single question about the interactions between Mother and Child during visits or any bond between the two. *See generally id.* at 26-35. Roya Paller, a social worker,[12] testified regarding a visit with Child in respite care[13] to assess Child's understanding of adoption. *Id.* at 7. Paller testified that Child expressed his desire to be adopted by "Mommy," his foster parent. *Id.* at 8-9. However, Paller provided no testimony as to Child's relationship with Mother, or whether she asked any questions with respect to any relationship or bond between Mother and Child.[14] *See generally id.* at 7-9. Paller was not asked a single question on cross-examination by any party. *Id.* at 9.

_____

[12] No testimony was elicited as to Paller's credentials; however, her report states she holds a Bachelor of Social Work and is employed by Forensic Social Work Services. Paller was called as a witness by Attorney Levin, representing Child's legal interests.

[13] *See* fn.6, *supra*.

[14] We also note that a review of Paller's report, admitted as CA-1, does not include any information about Child's understanding of adoption or any information about Child's relationship to Mother. Further, the report is undated, both in terms of when it was prepared and when Paller visited with Child.

Finally, we find the questioning of Mother, or lack thereof, with respect to bonding to be particularly lackluster. **See generally id.** at 93-94. Mother's counsel asked her a total of six questions regarding her relationship with Child, during which Mother expressed a close relationship with Child, stating that they are bonded like "a mother and a son." **Id.** Mother's counsel did not ask her to expand on any of her testimony, nor did representatives from DHS, the GAL, or the child advocate. **See id.** We, therefore, cannot conclude that counsel may withdraw on appeal. **See Santiago**, 978 A.2d at 360 ("Under **Anders**, the right to counsel is vindicated by counsel's examination and assessment of the record and counsel's references to anything in the record that arguably supports the appeal.").

Accordingly, we deny counsel's petition for leave to withdraw and remand the matter. Upon remand, counsel shall file either (1) an **Anders** brief that conforms to the requirements set forth in **Santiago**, **supra**; or (2) an advocate's brief on Mother's behalf within 30 days from the date of this decision. If counsel files an advocate's brief, Appellees shall have 30 days thereafter to file a responsive brief.

Case remanded. Petition to withdraw denied with instructions. Panel jurisdiction retained.

- 14 -

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 2/12/2024